IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

RAYFIELD AVIATION, LLC,           )
                                  )
            Plaintiff,            )
                                  )
        v.                        )       1:11CV274
                                  )
LYON AVIATION, INC.,              )
                                  )
            Defendant.            )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

Before the court in this contract dispute are cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure 56.  Plaintiff Rayfield Aviation, LLC ("Rayfield"), moves for partial summary judgment as to liability on its breach of contract claim.  (Doc. 120.)  Defendant Lyon Aviation, Inc. ("Lyon"), moves for summary judgment on Rayfield's claim.  (Doc. 121.)  For the reasons set forth below, Rayfield's motion will be denied, Lyon's motion will be granted, and the case will be dismissed.

## I.    BACKGROUND

### A.    The Parties

Rayfield is a limited liability company organized in 2007 under Delaware law with its principal place of business in North

Carolina.[1]   (Doc. 98 ¶ 1; Doc. 99 ¶ 1.)   Beginning in 2008,

George Townsend acted as Rayfield's Vice President and Chief

Financial Officer.   (Townsend 30(b)(6) Dep. at 15.)[2]   During the

relevant period, Rayfield's major assets included two airplanes:

a 1988 Gulfstream G-IV (the "G4"); and a Hawker.   (Id. at 56.)

Lyon is a Massachusetts corporation with its principal

place of business in Pittsfield, Massachusetts.   (Doc. 98 ¶ 2;

Doc. 99 ¶ 2; Mike Lyon Aff. ¶ 3.)[3]   During the relevant time,

Mike Lyon was the corporation's president.   (Mike Lyon Aff.

¶ 2.)   Lyon is a family-owned business that provides fuel,

maintenance, hangar services, flight instruction, charter

flights, and charter aircraft management.   (Id. ¶ 3.)   Charter

flights operations constitute a significant portion of its

business.   (Id. ¶ 4.)

**B.   The Contract**

In March 2009, Townsend and Mike Lyon began discussing the

---

[1] Rayfield invokes this court's diversity jurisdiction.   28 U.S.C.
§ 1332.   No individual member of Rayfield is a citizen of the same
State as Lyon.   See Meyn Am., LLC v. Omtron USA LLC, 856 F. Supp. 2d
728, 733 (M.D.N.C. 2012) (noting a limited liability company's
citizenship is that of its members).

[2] The deposition of George Townsend as Rayfield's designee pursuant to
Federal Rule of Civil Procedure 30(b)(6) is located at Docs. 61-17,
74-5, 124-5, and 126-4 and will be referred to as "Townsend 30(b)(6)
Dep."

[3] Michael P. Lyon's affidavit appears at Docs. 74-1, 124-1, and 126-1
and will be referred to as "Mike Lyon Aff."   Michael P. Lyon will be
referred to as "Mike Lyon," so as not to confuse him with the company.

possibility of a relationship between their two companies. Each enjoyed full responsibility to negotiate on behalf of his respective party. (Doc. 61-1 ¶ 3; Mike Lyon Aff. ¶ 5.) On March 6, Mike Lyon sent Townsend an introductory letter describing Lyon's business and thanking Townsend for considering Lyon as Rayfield's jet management company. (Doc. 126-17 at 3-4.) The letter included a bullet-point list of proposed contract terms and provided Townsend with contact information for persons affiliated with Lyon. (Id. at 5-6.) After exchanging several drafts (Docs. 124-21, 124-22, 124-25, 124-26, 124-27), the parties entered into an "Aircraft Lease and Management Services Agreement" (the "Agreement") on May 1, 2009, for a term of up to three years. (Doc. 124-8.)

The Agreement provided that Rayfield would lease its G4 to Lyon "for purposes of enabling [Lyon] to conduct charter flights." (Id. § 3.1.) In exchange for a management fee of $26,666.67 per month (id. §§ 2.17, 5.1, Schedule 1 ¶ 3), Lyon agreed to pay Rayfield rent "in an amount equal to the Charter Revenues collected by [Lyon] during the preceding month," with the incentive that if charter flights exceeded 150 hours in that period, Lyon was to keep fifteen percent of the month's excess Charter Revenue (id. § 4.1). Charter Revenue was defined as "100% of (a) the actual invoice charges for such flights, (b) the fuel surcharges for such flights, and (c) all forfeited

deposits or other amounts realized from cancelled or delayed flights." (Id. § 2.7.) Charter Revenue was not to include "incidental expenses charged to the charter customers associated with overnights, landing fees, catering, deicing taxes and similar expenses." (Id.)

### C. Course of Performance

After executing the Agreement, Lyon sent Rayfield monthly statements that included invoices for each charter flight operated in the previous month. (Townsend 30(b)(6) Dep. at 139.) Each statement included a summary of revenue for the month's charter flights as well as a copy of the invoice Lyon sent to each charter customer. (See, e.g., Doc. 124-34 at 3–11 (January 2010 statement and invoices).) The revenue summary included an entry for each charter flight taken that month and recorded hours flown, rate per hour, total invoiced amount, total fuel surcharge, any commission to Lyon (which was left blank if Lyon did not reach its 150-hour incentive), and net amount to Rayfield. (See, e.g., id. at 3 (summary of revenue for January 2010).) The net amount paid to Rayfield was the sum of the total invoiced amount and the fuel surcharge (and any forfeited deposits, if applicable), less any commission for exceeding the 150-hour incentive. (Id.) The attached invoices, which were copies of what Lyon had sent its charter customers, included the total invoiced amount (the rate per hour for the

flight multiplied by total hours flown), the fuel surcharges, and any other expenses associated with that flight for which Lyon billed the customer, such as "handling fees," "overnight fees," "landing fees," "catering," and "flight attendant fees." (See, e.g., id. at 4-11 (January 2010 invoices); Mike Lyon Dep. I at 88-89.)[4] Rayfield does not dispute that the Agreement contemplates Lyon's passing certain expenses of operating each charter flight to its charter customers. (Townsend 30(b)(6) Dep. at 159-60, 163, 165; Mike Lyon Dep. I at 76.)

### D. The Alleged Breach

Monthly during the first year of the contract, Lyon sent Rayfield the revenue, summaries, and copies of charter invoices, as outlined above, and Rayfield complied with its obligations under the Agreement. On two monthly cycles, Rayfield also paid Lyon performance bonuses under the Agreement for exceeding the 150-hour target. (Eugene Rayfield 30(b)(6) Dep. at 197-98.)[5] By May 2010, however, Townsend began to express concern over Rayfield's revenue under the Agreement.[6] After receiving the

---

[4] Mike Lyon's deposition was taken in two volumes: Volume I appears at Docs. 61-16, 124-10, and 126-6; Volume II appears at Docs. 124-16 and 126-8. They will be referred to as "Mike Lyon Dep. I" and "Mike Lyon Dep. II."

[5] Eugene Rayfield was deposed on January 8, 2013, in a supplemental 30(b)(6) deposition on behalf of Rayfield. It appears at Doc. 124-24 and will be referred to as "Eugene Rayfield 30(b)(6) Dep."

[6] Townsend originally testified in Rayfield's 30(b)(6) deposition that he may have raised a question about revenue in the fourth quarter of

April 2010 statement, Townsend wrote to Mike Lyon: "I'm a bit taken aback with the distribution of reported revenue between charter revenue (our revenue) and incidental expenses (your revenue) as defined in Section 2.7 of our [A]greement." (Doc. 124-17 at 2.) Townsend believed that Rayfield was to receive as Charter Revenue all amounts Lyon's invoices reflect were charged to Lyon's charter customers, except for "minor" expenses (which Townsend contends should be one or two percent of Charter Revenue). (Townsend 30(b)(6) Dep. at 134-35, 161.) According to Rayfield, Lyon withheld revenue from the total it should have received, principally in the form of large, round "handling fees" Lyon included on many of its invoices to customers (see, e.g., Doc. 124-34 at 5 ($14,000 handling fee)). (Townsend 30(b)(6) Dep. at 152; Townsend Dep. at 132-33.)[7]

On January 19, 2011, Rayfield gave thirty days' notice of termination of the Agreement. (Doc. 124-9 at 2.) Rayfield calculates that over their relationship Lyon improperly excluded from revenue $822,800.60 in charges, which Lyon contends are "incidental expenses" under Section 2.7. (Eugene Rayfield

---

2009, but he could not remember the date. (Townsend 30(b)(6) Dep. at 150-51.) However, the first documented evidence of a complaint is on May 7, 2010. (Doc. 124-17) Townsend's later testimony (Townsend 30(b)(6) Dep. at 179-80) and Mike Lyon's testimony (Mike Lyon Dep. II at 58) support the May 2010 date.

[7] Townsend's personal deposition appears at Docs. 74-6, 124-6, and 126-5 and will be referred to as "Townsend Dep."

30(b)(6) Dep. at 73.) "Handling fees" represent $654,071.91 of this amount, in addition to flight attendant fees, fees for additional flight crew, credit card conversion fees, and direct operating costs. (Id. at 137-38.) "Handling fees" encompass an assortment of expenses associated with specific flights, and there is no dispute that under the Agreement Lyon is ultimately responsible for collecting and paying such expenses.[8] Nevertheless, Rayfield contends that all such expenses constitute Charter Revenue due it under the Agreement.

## E. Procedural history

Rayfield filed its original complaint on April 7, 2011, seeking an accounting and damages for breach of contract. (Doc. 1.) After several discovery disputes, this court dismissed Rayfield's claim for an accounting. (Doc. 93.) Thereafter, Rayfield filed an amended complaint (the current operative complaint), asserting only a claim for breach of contract.

---

[8] According to Lyon's treasurer, Christine Carlson, "handling fees" were estimated expenses included in the quotes Lyon furnished to prospective customers. (Carlson Dep. at 23-24.) (Christine Carlson's deposition ("Carlson Dep.") appears at Docs. 74-13, 124-13, and 126-7.) The customer's invoice would then include an entry for handling fees if applicable to that particular flight. (Id. at 24-25.) Mike Lyon testified that Lyon would occasionally not receive invoices for these charges itself for several months. (Mike Lyon Dep. I at 81.) He also testified that handling fees could be for up to 100 different expenses, such that it would have been absurd to itemize each separate expense on each invoice. (Id. at 79-80.) Townsend confirmed that Mike Lyon told him handling fees were estimates. (Townsend Dep. at 133.) However, Townsend maintained that the fees were Charter Revenue because they were not small enough to be "incidental." (Id. at 131-32.)

(Doc. 98.)  At the close of discovery, both parties moved for summary judgment.  (Docs. 120, 121.)  Rayfield seeks partial summary judgment on liability, while Lyon seeks complete summary judgment.  Each party argues that the Agreement's language is unambiguous in its favor and, in the alternative, that extrinsic evidence supports its proffered interpretation.  Lyon also asserts defenses of waiver and estoppel.

## II.  ANALYSIS

### A.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine dispute of material fact remains. When the non-moving party has the burden of proof, the moving party is entitled to summary judgment if it shows the absence of material disputed facts.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 325 (1986).  When the moving party bears the burden of proof on the essential elements of its claim, it faces "a challenge more difficult than otherwise" in obtaining a judgment as a matter of law.  Francis v. Booz, Allen & Hamilton, Inc., 452 F.3d 299, 308 (4th Cir. 2006) (quoting Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1425 (11th Cir. 1990)). It must first produce "evidence that, if undisputed, would

entitle it to judgment." Wilkinson v. Rumsfeld, 100 F. App'x 155, 157 (4th Cir. 2004) (citing Brinkley v. Harbour Recreation Club, 180 F.3d 598, 614 (4th Cir. 1999)). "After the initial showing, summary judgment will be granted unless the opponent produces evidence upon which a reasonable jury could return a verdict in its favor." Id. (citing Celotex, 477 U.S. at 323–25).

In a breach of contract action, "[i]f a court properly determines that the contract is unambiguous on the dispositive issue, it may then properly interpret the contract as a matter of law and grant summary judgment because no interpretive facts are in genuine issue." Teamsters Local 391 v. Ball Corp., 355 F. Supp. 2d 803, 809 (M.D.N.C. 2005) (quoting World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 245 (4th Cir. 1992)). If the contract is ambiguous, the court may "examine evidence extrinsic to the contract that is included in the summary judgment materials, and, if the evidence is, as a matter of law, dispositive of the interpretative issue, grant summary judgment on that basis." Id. (quoting World-Wide, 955 F.2d at 245). Summary judgment must be denied if "resort to extrinsic evidence in the . . . materials leaves genuine issues of fact respecting the contract's proper interpretation." Id. (quoting World-Wide, 955 F.2d at 245).

## B.   Contract Interpretation

The parties agree that the Agreement should be construed under North Carolina law, consistent with its choice-of-law clause. (Doc. 124-8 § 16.1)  Under North Carolina law, "[w]hen the language of a contract is clear and unambiguous, construction of the contract is a matter of law for the court." Hagler v. Hagler, 354 S.E.2d 228, 234 (N.C. 1987).  Extrinsic evidence is not admissible unless the language of the contract is ambiguous.  See Holshouser v. Shaner Hotel Grp. Props. One Ltd. P'ship, 518 S.E.2d 17, 23 (N.C. Ct. App. 1999).  "An ambiguity exists in a contract if the 'language of a contract is fairly and reasonably susceptible to either of the constructions asserted by the parties.'"  Barrett Kays & Assocs., P.A. v Colonial Bldg. Co. of Raleigh, 500 S.E.2d 108, 111 (N.C. Ct. App. 1998) (quoting Bicket v. McLean Secs., Inc., 478 S.E.2d 518, 521 (N.C. Ct. App. 1996)).  "It is well settled that a contract is construed as a whole. . . .  Individual clauses are to be considered in context.  All parts of the contract will be given effect if possible."  Emmanuel African Methodist Church v. Reynolds Const. Co., 718 S.E.2d 201, 203 (N.C. Ct. App. 2011) (quoting Int'l Paper Co. v. Corporex Constructors, Inc., 385 S.E.2d 553, 555–56 (N.C. Ct. App. 1989)).

Each party contends that the Agreement is unambiguous, but in its favor.  Thus, the court begins with the contractual

language. At the center of the dispute is Section 2.7, which provides:

> The term "Charter Revenues" means, with respect to the charter flights arranged by [Lyon] on the [G4], 100% of (a) the actual invoice charges for such flights, (b) the fuel surcharges for such flights, and (c) all forfeited deposits or other amounts realized from cancelled or delayed flights. "Charter Revenues" shall not include incidental expenses charged to the charter customers associated with overnights, landing fees, catering, deicing taxes and similar expenses.

(Doc. 124-8 § 2.7.) Rayfield contends that the "handling fees" and other expenses shown on Lyon's customer invoices should have been considered part of the Charter Revenues remitted to Rayfield and cannot qualify as "incidental expenses." Lyon maintains that such fees were not part of the Charter Revenue and were expenses that Lyon passed along to its charter customers.

Lyon relies on a reading of Section 2.7 of the Agreement in conjunction with Sections 3.6 and 4.1. Section 4.1 provides:

> [Lyon] shall pay [Rayfield] rent (the "Rent") for its Lease operations monthly in an amount equal to the Charter Revenues collected by [Lyon] during the preceding month; provided, however, that with respect to any three calendar month period during the Term (without duplicating or overlapping any other such period), if (a) no Default or Event of Default by [Lyon] exists hereunder, and (b) [Lyon] has paid to [Rayfield] in full all Charter Revenues billed and collected for such period and for all prior months during the Term, then for any such period which charter flights conducted under [Lyon's] Part 135 Certificate exceed 150 hours, [Lyon] may retain 15% of the Charter Revenues collected in excess of the Charter Revenues collected for the first 150 hours of

such period. [Rayfield] may set the hourly charge and fuel surcharge for charter flights conducted by [Lyon]. Unless and until [Rayfield] notifies [Lyon] of different rates, [Lyon] shall charge its customers the same hourly rate and fuel surcharge for charter flights on [Lyon's G4]. Rent shall be paid by [Lyon] to [Rayfield] on or before the tenth (10th) day following the end of the month in respect of which such Rent is payable, and shall be accompanied by a record of such prior month's flights and charges reasonably acceptable to [Rayfield].

(<u>Id.</u> § 4.1.) Additionally, Section 3.6 states:

> Except as expressly provided in Paragraph 10 of Schedule 1 (relating to [Rayfield's] responsibility to pay for certain incidental expenses not charged to [Lyon's] charter customers), and Section 7.1.1 (relating to [Rayfield's] obligation to reimburse [Lyon] for fuel for charter flights), [Lyon] shall be responsible for all costs of flight crew, incidental expenses, [sic] other costs for all flights conducted by [Lyon] in the [G4] while under Lease.

(<u>Id.</u> § 3.6.) Lyon contends that it has not breached the Agreement because it satisfied its obligation under Sections 2.7 and 4.1 to provide all of the Charter Revenue to Rayfield. Under Lyon's interpretation, pursuant to Section 3.6 it was responsible for, and thus was to bill its charter customers for, "incidental expenses" associated with its charter flights. The Agreement does not define "incidental expenses." Lyon defines them as those "incurred casually and in addition to the regular or main amount," relying on DICTIONARY.COM, http://dictionary.reference.com/browse/incidental (last visited Mar. 26, 2014). Because there is no dispute that, apart from

the contested amount, Lyon has satisfied its contractual obligations, it will prevail if its interpretation is correct.

Rayfield attacks Lyon's position in a number of ways. It contends that the "handling fees" are part of Charter Revenue because they were included on invoices to Lyon's charter customers, and Charter Revenue was defined as 100% of "actual invoice charges" for charter flights. Rayfield offers an example to support its argument: it posits that all charges on Lyon's *initial* invoice to a client constitute "Charter Revenue," but concedes that expenses billed later do not. (Doc. 130 at 3-4.) According to Rayfield, this is because expenses billed later are most likely "minor."

Plainly, nothing in the Agreement supports any interpretation that is arbitrarily based on the temporal nature of the charge. Rayfield's interpretation also leaves much of Section 2.7 without meaning. If "actual invoice charges" were to mean all charges actually invoiced to the customer, Section 2.7's clauses regarding fuel surcharges and forfeited deposits would be mere surplusage. This interpretation offends the principle that "an interpretation which gives a reasonable meaning to all provisions of a contract will be preferred to one which leaves a portion of the writing useless or superfluous." Emmanuel, 718 S.E.2d at 204 (quoting Int'l Paper, 385 S.E.2d at 556).

The Agreement must be read as a whole, and Section 4.1 informs Section 2.7. Section 4.1 notes that Lyon will charge its charter customers an hourly rate, plus fuel surcharge, for each flight on the G4. In the context of this description of how the charter customers would be billed, Section 2.7 cannot reasonably bear the meaning Rayfield ascribes to it. In context, it is clear that "actual invoice charges" refers to the hourly charges for the G4; this revenue was to be supplemented by fuel surcharges. Section 2.7 designated both as Charter Revenue. However, pursuant to Section 3.6, Lyon also had the responsibility to pay for expenses associated with charter flights.[9] Section 2.7 thus acknowledged that Lyon would bill its charter customers for such expenses in order to avoid incurring a loss after compensating Rayfield.[10]

Rayfield's interpretation of the Agreement also strains the accepted meanings of "revenue" and "expenses." If Rayfield were correct, it would be entitled not only to Lyon's revenue from operation of the G4, but also to a large portion of Lyon's expenses and estimated expenses. Put another way, Rayfield's

---

[9] Rayfield concedes that Lyon was to pay the expenses at issue and to seek reimbursement from its customers. (Townsend 30(b)(6) Dep. at 163-64.)

[10] Section 3.6's reference to Schedule 1 Paragraph 10 also supports this construction because that paragraph provides that Rayfield would be responsible for certain incidental expenses "not covered on invoices to [Lyon's] customers." (Doc. 124-8 at 39.)

interpretation seeks to guarantee payments to it for obligations *Lyon* incurred for services *from third parties*. Because Lyon was responsible for paying the expenses at issue, it cannot be a reasonable interpretation that the Agreement required Lyon to remit these expenses, much less all but the "minor" ones, to Rayfield. Rayfield's interpretation also conflicts with the overall purpose of the Agreement. Under Rayfield's interpretation, if a charter flight incurred significant expenses due to circumstances outside of Lyon's control (such as, for example, high overflight fees or other expenses associated with international flights), Rayfield would be entitled to receive those expenses even though it bore no responsibility to pay for them under the Agreement. This stretches the language far beyond anything the parties could have intended at execution. See Quorum Health Res., LLC v. Hugh Chatham Mem'l Hosp., Inc., 552 F. Supp. 2d 527, 533 (M.D.N.C. 2007) (noting that "a contract should be read in a way which balances the duties and obligations between the parties because that is the usual purpose for contracting" and that "[t]he Court should avoid a skewed and grossly inequitable reading of the contract").

It is true, as Rayfield contends, that some dictionary definitions of "incidental" – other than the ones relied upon by Lyon – imply that it is a synonym for "minor." See, e.g.,

Webster's Third New Int'l Dictionary 1142 (1986) (defining "incidental" as "occurring as a minor concomitant," or, when used as a noun, "minor items (as of expense) that are not particularized").[11]   However, "the fact that a dictionary provides multiple definitions of a word used in a contract does not render the contract ambiguous.   Ambiguity in a contract 'is found to exist . . . only when the contract taken as a whole, is reasonably subject to differing interpretation.'"   <u>Hawaiian Ass'n of Seventh Day Adventists v. Wong</u>, 305 P.3d 452, 467 (Haw. 2013) (quoting <u>Sturia, Inc. v. Fireman's Fund Ins. Co.</u>, 684 P.2d 960, 964 (Haw. 1984)).[12]   Because the entire Agreement is not reasonably susceptible to Rayfield's proffered meaning of

---

[11] Notably, these definitions come *after* the primary definitions, which include "subordinate, nonessential, or attendant in position or significance." <u>Id.</u>  By this measure, the $822,200.60 Rayfield claims as damages are expenses "incidental" to the approximately $5.2 million Lyon paid Rayfield in Charter Revenues.

[12] North Carolina does not appear to have addressed the issue of whether multiple dictionary definitions, standing alone, may create ambiguity in a contract.  However, given that North Carolina courts have held that contract language must be considered in its entirety, rather than in isolation, the reasoning of courts in other jurisdictions to that effect is persuasive.  <u>See also, e.g.</u>, <u>Kootnz v. Ameritech Servs., Inc.</u>, 645 N.W.2d 34, 42 (Mich. 2002) ("A word is not rendered ambiguous, however, merely because a dictionary defines it in a variety of ways."); <u>Citation Ins. Co. v. Gomez</u>, 688 N.E.2d 951, 953 (Mass. 1998) ("Nor does the mere existence of multiple dictionary definitions of a word, without more, suffice to create an ambiguity, for most words have multiple definitions."); <u>Cincinnati Ins. Co. v. Flanders Elec. Motor Serv., Inc.</u>, 40 F.3d 146, 152 (7th Cir. 1994) ("The existence of multiple dictionary definitions does not compel the conclusion that a term is ambiguous."); <u>Melrose Hotel Co. v. St. Paul Fire & Marine Ins. Co.</u>, 432 F. Supp. 2d 488, 501 (E.D. Pa. 2006) ("If multiple definitions alone created ambiguity, insurance policies would either lose all meaning or would devolve into epic tomes.").

"incidental expenses," these other definitions do not create an ambiguity.

Rayfield's observation that handling fees were not specifically mentioned in Section 2.7 does not change the result. The provision states that "Charter Revenues shall not include incidental expenses charged to the charter customers associated with overnights, landing fees, catering, deicing taxes and similar expenses." Under the well-established canon of construction *ejusdem generis*, "where general words follow a designation of particular subjects or things, the meaning of the general words will ordinarily be presumed to be, and construed as, restricted by the particular designations and as including only things of the same kind, character and nature as those specifically enumerated." <u>State v. Fenner</u>, 140 S.E.2d 349, 352 (N.C. 1965) (interpreting a criminal law); <u>Whitaker v. Old Dominion Guano Co.</u>, 31 S.E. 629 (N.C. 1898) (applying canon to contract interpretation). Here, while "similar expenses" could not serve as a catch-all for any possible expense, when interpreted in conjunction with "incidental expenses," it reasonably includes all expenses casually incurred in the normal course of chartering a flight. Rayfield does not contend that the "handling fees" at issue in this case were not incurred in

relation to Lyon's charter business on the G4.[13]   Nor does it
dispute that the other expenses it claims are Charter Revenue
were also related to charter flights, such as flight attendant
fees.

Despite claiming that the Agreement is not ambiguous in its
favor, Rayfield also points to extrinsic evidence.   But even if
the Agreement could be said to be ambiguous to permit reliance
on such evidence, both the pre-formation and post-formation
conduct demonstrates that Lyon's interpretation is correct.

Importantly, the parties' communications prior to execution
of the Agreement support Lyon's position.   On April 29, 2009,
Townsend sent an e-mail to Mike Lyon inquiring about Charter
Revenue and incidental expenses.   (Doc. 124-12 at 2.)   Townsend
wrote:

> Also, I have just one more comment about the
> contract that I do want to bring up before we sign.
> This is a revisit of our previously agreed
> specifications and I realize that.   It's not a huge
> deal to me either way but in final reading it does
> seem odd the way we are doing this one thing.   We say
> in the section that defines Charter Revenue that it
> excludes incidental expenses charged to clients for
> costs associated with overnights, landing fees,
> catering, deicing, etc.   What seems odd is that these
> expenses, or at least some of them, are expenses that
> we would be paying for.   I believe we would be paying
> for the landing fees, deicing, and crew overnight

---

[13] In his personal deposition, Townsend did not indicate that he
doubted Lyon's account of what the handling fees represented.
(Townsend Dep. at 146.)   Rather, he contends they should be included
in Charter Revenue regardless of their nature as expenses because they
are too large to be classified as "incidental."   See supra n.8.

costs, etc.  If we are paying for them why would we
not get the revenue?  It seems to boggle up what is
otherwise so simple an agreement.  [sic]

Mike, I'm in no way trying to take away income
that you were counting on.  If this is something
that's important to you than [sic] we can leave it as
is.  If it's an important part of your income but you
are flexible on how to obtain it, we can talk about
cleaning it up here and replacing your income
somewhere else.  Let me know what you think.

(Id.)  In reply, Mike Lyon wrote: "The misc. expenses like
landing fees, de-icing etc. . would be paid directly by Lyon and
removed from the [C]harter [R]evenue prior to Lyon submitting
the revenue.  It's going to be easier for both parties to handle
this way.  If this is unclear we should discuss."  (Id. (no
alteration from original).)  Townsend responded: "Sounds good.
Thanks for clearing that up."  (Id.)  Later, Rayfield's
attorney, Joseph Hardy, wrote Townsend in order to clarify
Rayfield's responsibility under the Agreement.  He wrote:
"Rayfield is only responsible for those listed overnight costs
in the case of one-way charter flights, and only if those costs
are not passed on to Lyon's charter customers.  [Rayfield is]
not paying for overnight or other incidental expenses that are
passed on to the customers."  (Doc. 124-14 at 2.)  Townsend
indicated that he understood.  (Id.)

These discussions addressed the very problem Rayfield now
raises.  Townsend was concerned that the Agreement would be
interpreted to require Rayfield to pay for incidental expenses

for which it would not reimbursed. However, Mike Lyon pointed out that the Agreement required no such double-counting; instead, Rayfield would not be responsible for incidental expenses. Lyon would recover its expenses from its customers, leaving Rayfield out of the loop entirely. This explanation satisfied Townsend in 2009, yet Rayfield now seeks to double-count revenue in its own favor. In doing so, Rayfield asks the court to find that the Agreement requires Lyon to bear the risk of passing on its expenses to its charter customers *and* to remit those sums to Rayfield even though Lyon was left to pay the obligations to the third-party vendors. Townsend recognized the inequity of a similar interpretation in 2009 and agreed with Mike Lyon that Lyon would handle its expenses, which would not be included in Charter Revenue. This inequity is revealed by the economic reality of Rayfield's damages claim. Rayfield claims Lyon owes it additional revenues of $822,800.60 (representing expenses Lyon was responsible for and paid), whereas Rayfield was required to pay Lyon only $586,666.74 in rent under the Agreement over the same 22 month period.[14] If this were how the Agreement was meant to operate, it would have Lyon operating at a constant, substantial loss. Rayfield's

---

[14] In fact, Lyon received $576,657.56 in rent from Rayfield. (Doc. 124-3 ¶ 4.) The difference likely results from the fact that the Agreement was terminated in the middle of the twenty-second month.

construction is so skewed and grossly inequitable that it cannot be a reasonable interpretation.

In addition, the course of performance reveals that the parties intended the Agreement to carry Lyon's proffered meaning. The Agreement was executed on May 1, 2009, and Townsend did not lodge a written protest of the handling fees until May 7, 2010. Prior to the protest, Townsend had received Lyon's monthly invoices, which included expenses characterized as "handling fees" as large as $21,100. (Townsend 30(b)(6) Dep. at 149-50 (referring to the August and September 2009 revenue reports).) Townsend responded positively to the receipt of Lyon's August 2009 statement, writing Mike Lyon, "I can't thank you and your group enough for doing such a great management job for this period." (Doc. 124-28 at 2.) Moreover, Townsend recommended Lyon to Beth Gordon of Goldman Sachs on November 25, 2009. (Townsend 30(b)(6) Dep. at 146.) Townsend said of Lyon, "I can't say enough good things about this smaller but up-and-coming family business." (Id.; Doc. 124-28 at 3 (e-mail to Gordon).) He attempted to backtrack from the recommendation at his 30(b)(6) deposition, claiming he was only trying to steer some business Lyon's way in order to increase Rayfield's revenue under the Agreement. (Townsend 30(b)(6) Dep. at 147.) But the combination of the recommendation and duration of performance

without complaint reinforces Lyon's interpretation of the Agreement.

Thus, the undisputed extrinsic evidence also supports Lyon's position that the damages claimed are not Charter Revenue.[15]

## III. CONCLUSION

Because the court concludes that the Agreement is unambiguous and Lyon's interpretation is correct, Lyon's motion for summary judgment will be granted. Alternatively, even if the Agreement could be said to be ambiguous, the proffered extrinsic evidence supports Lyon's interpretation. Because Lyon has prevailed on the merits, the court need not address Lyon's alternative arguments that it is entitled to the defenses of waiver and estoppel.

IT IS THEREFORE ORDERED that Rayfield's motion for partial summary judgment (Doc. 120) is DENIED, Lyon's motion for summary judgment (Doc. 121) is GRANTED, and the case is DISMISSED WITH PREJUDICE.

                                    /s/ Thomas D. Schroeder
                                 United States District Judge

March 31, 2014

---

[15] Both parties note the well-established interpretive canon that a contract is to be construed strictly against its drafter. See, e.g., Silvers v. Horace Mann Ins. Co., 378 S.E.2d 21, 25 (N.C. 1989). Here, Lyon claims that Rayfield drafted the Agreement, yet Rayfield claims that Lyon drafted Section 2.7. The evidence on this issue is inconclusive. For the reasons noted, however, even a construction against Lyon would not alter the court's conclusion.